## THE GUARDIAN.

(District Court, D. Washington, N. D. October 24, 1898.)

SHIPPING—RIGHT OF PASSENGER TO RESCIND CONTRACT—REPORTED UNSEAWORTHINESS OF VESSEL.

Passengers who have paid their passage on a vessel cannot be held to their contract, but are entitled to rescind and recover their passage money, where, before sailing, the vessel was reported in the press as rotten and unsafe, and they were justified by their information and her appearance in believing her so, though she may in fact have been staunch and seaworthy.

J. B. Metcalf, for libelant and interveners.
James Kiefer, for respondent.

HANFORD, District Judge. The libelant and each of the interveners contracted for transportation for himself and baggage on board the bark Guardian, from Seattle to Kotzebue Sound, for which they each paid $125. Tickets were issued to them, and they were received on board. Before the departure of the vessel from Seat-

tle, they abandoned the trip, and have brought this suit to recover back the money paid for their tickets, and they also claim damages for alleged loss of time. The reason assigned for leaving the ship is that she was an old vessel, and appeared to be unseaworthy, and each of these parties believed that it would be unsafe to venture out to sea in her.

From a careful reading of all the evidence, I have reached the conclusion that the Guardian, although 35 years old, was in fact staunch and strong, and in much better condition for meeting the perils of navigation than she appeared to some of the witnesses who examined her only in a very superficial way. The testimony shows that, on her passage north, she encountered very heavy weather, and went through it without loss of a spar, sail, or rope, and that she landed her passengers and cargo safely at their place of destination. On her return she struck a rock on the north shore of Tigaldi Island. Her officers and crew succeeded in backing her off, but she was immediately caught upon other rocks, and became a total wreck. The disaster cannot be attributed to unseaworthiness of the vessel. The circumstance proves conclusively that her timbers were sound, and that she was strongly built, for she was pounding upon the rocks for more than 1 hour before she commenced to take in water through her hull, and she continued to pound for about 15 hours before she filled and sank. While in fact she was a good ship, her outside appearance, when she was getting ready for this voyage, was not in her favor. It is probable that, while in the coasting trade, her officers and crew gave no attention to cleanliness or ventilation, so that below deck she was damp and moldy, and her skin was decayed. She was also hogged, so that her deck and keelson were out of line. These and other circumstances were made the basis of a published report that the ship was unseaworthy; and, in consequence, some of the passengers requested a survey, which was made by three persons selected by the owners, who made the following report:

"April 23, '98.

"We, the undersigned, being called upon by a comitte of passengers from the 'Barque Guardian,' to inspect said vessell, and to dertimine upon the sea worthiness & worthiness to carry passengers to Kotzbue Sound, we hereby upon inspection reach the following conclusion: That the frames, water ways, deck frames & kelson of the vessel are in good condition. We further find that part of the ceiling, hooks, pointers & part of the fastenings to be in a defective condition, and we believe the vessel could make the voyage to Kotzubue Sound in her present ballast trim with safety. Still, we cannot recommend her for a passenger vessel in her present condition."

It does not appear that, after this report had been made, the owners took any steps to repair the ship, or cure the particular defects which the report specified. The report is very indefinite, and seems to vaguely hint at a condition of things more serious than the surveyors intended. Certainly, travelers who do not know anything about the construction of ships would naturally take alarm from a report made by persons presumably possessed of expert knowledge, saying that "we further find that part of the ceiling, hooks, pointers, and part of the fastenings to be in a defective condition"; and this

followed by the statement, "Still, we cannot recommend her for a passenger vessel in her present condition." Sailors who have signed articles for a voyage cannot be compelled by legal process to fulfill their contract if they refuse to go to sea for the reason that they believe the ship to be unseaworthy, unless upon a survey the vessel is found to be staunch and strong, and properly equipped and supplied for the contemplated voyage. I hold that passengers are entitled to as much protection as the crew of a ship, and that they have the right to act in the light of appearances. A prudent man, who cares for his own safety, will not risk his life by going to sea in a vessel after she has been reported to be old and rotten and unsafe for the voyage, and such report has been partially confirmed by a survey, when the experts making the survey say in their report that they cannot recommend her as a passenger ship in her present condition. In every contract for the transportation of passengers by sea, there is an implied warranty on the part of the owner that the vessel is seaworthy, or that she will be made seaworthy before proceeding upon the voyage; and it is the duty of the owners of the ship to make all necessary repairs, and remedy all known defects in the construction of the vessel, so that her appearance will inspire confidence in those who may make inquiries as to her condition. Failure to make necessary repairs, or to remedy known defects, in the construction or equipment of a ship, before proceeding upon a voyage, constitutes a breach of the carriers' contract with her passengers; and passengers have a right, when there has been such breach of contract, to refuse to go in her, and to recover damages as for any other breach of contract.

The evidence is insufficient to establish any facts affording a basis for the assessment of damages in excess of the amount paid for the tickets, and interest from the date on which a demand was made for the return of the money. A decree will be entered awarding to the libelant and each of the interveners the sum of $125, with interest thereon at the rate of 7 per cent. per annum from the 25th day of April, 1898.